# Steve Zissou & Associates

42-40 Bell Boulevard | Suite 302 | Bayside | New York | 11361 | 718.279.4500 | stevezissou@stevezissouesq.com

March 18, 2026

**BY ECF (EX PARTE AND UNDER SEAL)**

The Honorable Joan M. Azrack
United States District Court
100 Federal Plaza
Central Islip, New York 11722

      Re:    *United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
                Cross-Examination of Walter Collier

Your Honor,

I write pursuant to the Court's invitation at sidebar this afternoon to provide a structured offer of proof regarding the proposed scope of my cross-examination of Walter Collier when trial resumes tomorrow morning. I am grateful for the opportunity to address Your Honor's concerns before the jury reconvenes, and I will endeavor to be as precise and as candid as the gravity of the occasion demands.

Let me begin with an observation about what Mr. Collier's direct examination actually accomplished. Over the course of several hours, the witness told this jury—with practiced authority—that ShotSpotter[1] detects ninety percent of detectable outdoor gunfire, that its location determinations are accurate to within twenty-five meters, and that a company-employed human reviewer confirms each alert before it reaches law enforcement. These representations are not peripheral to the Government's case; they are its foundation. In each of the ten incidents presented through Mr. Collier, the ShotSpotter report—and the claims embedded within it—functioned as corroboration that a shooting occurred at the identified location on the identified date. Before this jury may fairly weigh that evidence, it is entitled to understand that those representations are contested, that independent study after independent study has found them wanting, and that the real-world performance of this product diverges substantially from its marketing.

The Government's Rule 403 motion characterizes my intended cross-examination as the construction of a "trial within a trial." I respectfully suggest that this characterization has matters backwards. It is the Government that introduced an expert witness whose testimony

---

[1] In April 2023, the company rebranded to SoundThinking but retained the ShotSpotter product name. Max Blaisdell and Jim Daley, "ShotSpotter Keeps Listening After Contracts Expire," *South Side Weekly* (April 24, 2024). Available online at https://southsideweekly.com/shotspotter-soundthinking-keeps-listening-after-contracts-expire-chicago-san-diego-san-antonio-indianapolis/. Last accessed March 18, 2026.

*United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
March 18, 2026

necessarily imports SoundThinking's product-wide reliability claims into this proceeding. To tell this jury that ShotSpotter achieves ninety-percent detection accuracy and twenty-five-meter location precision is to invite scrutiny of those claims. Cross-examination that tests them—with independent audits, peer-reviewed studies, documented field failures, and the sworn testimony of SoundThinking's own expert witnesses in other proceedings—is not a distraction from the issues in this case. It is, in significant part, the issue in this case, to the extent that ShotSpotter evidence is offered as proof of anything.

Rule 403's prohibition runs to unfair prejudice—not to probative evidence that happens to be damaging. The cross-examination I propose is directed entirely at the reliability of the methodology Mr. Collier applied in this case, the accuracy of the claims he made under oath about that methodology, and the weight this jury should therefore assign his conclusions. Each category of questioning I intend to pursue has a clear, articulable connection to those objectives, which I will set forth below.

### Mr. Collier's Livelihood Complicates His Testimony

The first category of inquiry concerns Mr. Collier's personal financial and professional interest in the outcome of proceedings such as this one. He has testified approximately one hundred and ninety times as an expert on behalf of SoundThinking. His livelihood depends on his company's contracts with law enforcement agencies. If the evidentiary value of ShotSpotter reports is diminished in courts of law—and particularly in federal courts—the business consequences for SoundThinking are direct and material. This is precisely the kind of institutional bias that cross-examination exists to expose.

The structural incentives built into SoundThinking's municipal contracts compound this concern. The City of Chicago's contract with ShotSpotter imposed a monetary penalty on the company if it failed to detect ninety percent of outdoor gunfire incidents—but contained no corresponding penalty for false alarms, regardless of their number or frequency. That contractual asymmetry created a direct financial incentive for ShotSpotter employees to issue gunfire alerts liberally, tolerating false positives in order to protect against the detection shortfall that would trigger a contract penalty. Mr. Collier's role as a company expert who has testified nearly two hundred times in favor of ShotSpotter's reliability must be understood against this institutional backdrop.

### The Reliability of ShotSpotter

The more substantial category of inquiry concerns the scientific and practical reliability of ShotSpotter's methodology—not merely as applied in Chicago or elsewhere, but as an integrated system whose core claims Mr. Collier repeated under oath in this courtroom today. The Government objects to any inquiry about specific cases in other jurisdictions on the ground that doing so would require this jury to adjudicate those matters on the merits. I understand the concern, and I will address it directly: I am not asking this jury to adjudicate anything about Chicago. I am asking this jury to understand that the claims Mr. Collier made on direct

*United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
March 18, 2026

examination are contradicted by documented, publicly reported, and independently verified evidence—including the sworn testimony of SoundThinking's own forensic witnesses in other proceedings.

### A. The "Ninety-Percent Detection" Claim

Mr. Collier testified that SoundThinking guarantees its customers the detection of ninety percent of detectable outdoor gunfire—and that the company's own data supports this figure. What independent analysis of Chicago's deployment found—based on GPS-timestamped Chicago Police Department shooting records, not on voluntary complaints filed by police departments, and not on SoundThinking's internal metrics—is that the system routinely fell well short of this threshold. In one documented incident in December 2022, fifty-five rounds were fired in close proximity to three functioning ShotSpotter sensors. None of those sensors triggered an alert. Internal SoundThinking emails, disclosed pursuant to a Freedom of Information Act request by South Side Weekly, reflect that company executives knew the sensors were, in their own words, "broken or compromised by ambient noise," and expressly discussed the inadvisability of disclosing this fact to the public safety official who had complained. I intend to ask Mr. Collier whether he is aware of that incident, whether he is aware of those emails, and—most importantly—whether he can represent to this jury that the sensors involved in the incidents at issue in this case were functioning properly on each of the relevant dates.

The deployment in Rochester, New York further illustrates the gap between ShotSpotter's marketing and its field performance. In one documented incident in that city, the ShotSpotter system failed to detect gunshots by misclassifying the sounds as helicopter-generated. When the local police department inquired days later, a ShotSpotter employee reclassified the sounds as gunfire at the police department's direction—then a second employee revised the count again, changing the number of detected shots from four to five. In a separate Rochester event, the deployed system failed to detect twenty-five of twenty-nine gunshots and mislocated the shots by a mile and a half. These are not marginal imprecisions. They are systematic failures of the core detection and location functions that Mr. Collier vouched for on direct examination.

### B. The "Ninety-Seven Percent Accuracy" Claim

Mr. Collier endorsed on direct examination the company's claim of approximately ninety to ninety-seven percent accuracy—a figure that appears in SoundThinking's marketing materials, its municipal contracts, and the testimony of its witnesses in courts throughout the country. I intend to demonstrate that this figure is not derived from independent testing, not calculated by comparison with crime reports, and not produced through any recognizable scientific protocol. It is generated by counting only those alerts about which a police department voluntarily files a complaint with SoundThinking. Since police departments almost never file such complaints regardless of what they find at the scene, the metric is very nearly tautological.

Page **4** of **8**
*United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
March 18, 2026

This is not my characterization; it is the sworn testimony of Paul Greene—SoundThinking's own forensic expert witness—who testified in a San Francisco court that the accuracy figure was "put together by our sales and marketing department, not our engineers."[2] Mr. Greene is Mr. Collier's colleague and counterpart.

Mr. Greene's sworn testimony in other proceedings yields a second, equally damaging admission: that he himself must correct ShotSpotter's algorithm output "anywhere from half to two-thirds of the incidents" he reviews.[3] That is not the error profile of a system that is ninety-seven percent accurate. It is the error profile of a system whose algorithm regularly misinterprets the data it collects, and whose reliability depends entirely on the subjective judgment of the human reviewer who intervenes—a human reviewer whose qualifications I address below.

C. The Absence of Validation Testing

Underlying every specific failure I have described is a foundational scientific defect that Mr. Collier has never been required to address under oath: SoundThinking has never subjected the ShotSpotter system to the validation testing that the scientific community universally requires of forensic methods before they may be used in criminal proceedings. This is not a matter of degree or emphasis. The President's Council of Advisors on Science and Technology, the National Academy of Sciences, the National Commission on Forensic Science, and every relevant scientific working group in the forensic disciplines have stated, repeatedly and unequivocally, that empirical validation testing is the only way to establish the reliability of a forensic method. *See*, e.g., National Commission on Forensic Science, "Validation of Forensic Science Methodology" (2016), at 2.[4] ShotSpotter has conducted neither the "developmental validation" that manufacturers are required to perform before marketing a forensic tool, nor the "internal validation" that law enforcement agencies are required to conduct before deploying one. *Id.*

The practical consequences of this omission are not hypothetical. A noise detection system's performance varies dramatically depending on factors including the distance from the gunshot to the microphone, line-of-sight or non-line-of-sight conditions, ambient noise levels, the firearm's make and model, urban density, time of day, and weather conditions. Without validation testing across this range of variables—testing that ShotSpotter has apparently never conducted—neither this Court nor this jury can have any scientifically grounded basis for assessing how frequently the system correctly identifies and locates a gunshot, how frequently it misidentifies or mislocates one, or whether the sensors deployed in the specific locations at issue in this case were capable of providing reliable results on the dates in question.

---

[2] Testimony of Paul Greene, ShotSpotter Manager of Forensic Services, *California v. Reed*, Case No. 16015117 (Cal. Super. Ct. S.F. County July 10, 2017) at 311.
[3] Greene Testimony in *California v. Reed*, at 104, 112.
[4] Available online at https://www.justice.gov/ncfs/file/831546/dl?inline. Last accessed March 18, 2026.

*United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
March 18, 2026

D.  The Algorithm and Software Validation Failure

ShotSpotter's reliability failure extends beyond the absence of field validation to the algorithm at the system's core. The Institute of Electrical and Electronics Engineers and analogous standards bodies have established well-recognized protocols for validating forensic software—protocols that require independent testing by an organization not affiliated with the software's developers, a written verification and validation plan, and ongoing re-validation whenever the code is modified.[5]

SoundThinking has complied with none of these requirements.

Its algorithm has never been independently tested or validated. No court, no defendant, and no law enforcement agency has ever been permitted to examine the source code. And in mandatory disclosures to the Securities and Exchange Commission—where the company's obligation to candor is legally enforced in a way it apparently is not in courts of law— SoundThinking has acknowledged that its software is complex, that undetected errors and bugs may occur, that deployment in the field may expose additional failures, and that the company sometimes cannot identify the cause of performance problems within an acceptable period of time. SoundThinking, Inc., SEC Form 10-Q Disclosure (August 13, 2025).[6]

I intend to ask Mr. Collier whether he is aware of those admissions, and whether he disclosed them to this jury during his direct examination.

E.  Mr. Collier's Own Training and Qualifications

Walter Collier presents himself to this jury as a forensic expert. The record in other proceedings tells a different story. In response to a defense subpoena in the *Williams* case—a subpoena that specifically requested all materials used during the training of Mr. Collier— SoundThinking could not produce a single training document: not a textbook, not a presentation, not a written exercise, not any other training material. The company responded in writing that its experts are trained through "on the job" knowledge transfer and that "no official or formal training materials exist for our forensic experts specifically." The company likewise failed to produce any proficiency testing records for Mr. Collier.

That response is consistent with what SoundThinking's own expert, Paul Greene, has confirmed under oath: that the employees who conduct ShotSpotter's forensic reviews are

---

[5] The Court should treat standards from the IEEE as authoritative and as representative of the views of the software engineering community. *See*, e.g., *Electro-Mechonical Corp. v. Power Distribution Prods.*, 894 F. Supp. 2d 798, 807 (W.D. Va. 2012) (observing that an IEEE dictionary standard was "a well-regarded reference"). Furthermore, many private and governmental organizations have recognized and adopted such standards, including the Department of Defense, the Food and Drug Administration, the Nuclear Regulatory Commission, and the International Organization for Standardization. *See*, e.g., Transcript of Proceedings, *United States v. Gissantaner*, Case No. 17 Cr. 130 (JTN) (W.D. Mich. May 24, 2018), at 135–37.

[6] Available online at https://ir.soundthinking.com/sec-filings/quarterly-reports/content/0000950170-25-108070/0000950170-25-108070.pdf. Last accessed March 18, 2026.

customer service representatives typically holding no more than high school diplomas, who receive two to six weeks of informal mentoring before being tasked with making forensic determinations that may send police officers into dangerous situations and, as in this case, form the basis for federal criminal charges. These employees are allocated thirty to forty seconds to conduct their "forensic evaluation" of each noise event before deciding whether to forward a gunfire alert to law enforcement.[7]

No legitimate forensic discipline operates this way. No forensic lab in the country would accept it. The jury is entitled to know it.

### The Case of Michael Williams

I turn now to the matter Your Honor specifically addressed at sidebar this afternoon—the matter of Michael Williams.

I raised the *Williams* case not for the purpose of retrying it in this courtroom, but because it represents the most direct available evidence of what occurs when ShotSpotter evidence is actually subjected to independent judicial scrutiny. Mr. Williams, a sixty-three-year-old man in Chicago, was charged with murder based in substantial part on a ShotSpotter alert. He spent nearly a year in Cook County Jail. When prosecutors were confronted with a Frye hearing at which the scientific validity of the ShotSpotter methodology would have been examined on the merits, they withdrew all ShotSpotter evidence. The charges against Mr. Williams were dismissed. On March 4, 2026—fourteen days ago—the City of Chicago agreed to pay Mr. Williams $500,000 to settle his civil suit. Heather Cherone, "A Chicago Man Was Charged with Murder Based on a ShotSpotter Alert. Now the City Will Pay Him $500K," WTTW Public News (March 4, 2026).[8]

*Williams* also illustrates with particular clarity how ShotSpotter's human review process can transform innocuous data into the centerpiece of a criminal prosecution. In that case, an anonymous ShotSpotter employee overrode the company's own algorithm—which had classified the noise event as originating from a firecracker—and substituted a determination of gunfire. Months later, Walter Collier—the same witness who testified before the jury today—overrode the algorithm's location determination, moving the reported location of the event from its initial coordinates to a point more than a mile away that aligned with the preferred police theory of the crime. Through that sequence of subjective, undocumented human interventions, data that supported no criminal charges whatsoever became the foundation of a first-degree murder prosecution. That sequence is not anomalous. It is how the ShotSpotter system works.

What makes the *Williams* case probative in this proceeding is not the underlying facts of the Chicago homicide—which I have no interest in litigating here—but the pattern of which

---

[7] Greene Testimony in *California v. Reed*, at 20, 154–55.
[8] Available online at https://news.wttw.com/2026/03/04/chicago-man-was-charged-murder-based-shotspotter-alert-now-city-will-pay-him-500k. Last accessed March 18, 2026.

*United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
March 18, 2026

it is a part. In multiple proceedings across multiple jurisdictions, when defense counsel has filed motions challenging the scientific validity of ShotSpotter evidence, prosecutors have withdrawn that evidence rather than defend it before an independent judicial examiner. SoundThinking represents to courts, in its own marketing materials and through its expert witnesses, that ShotSpotter evidence has been admitted in over two hundred cases in twenty states. What that representation omits is that admission without challenge is not survival of scrutiny. The relevant datum is what happens when the science is actually examined. What happens, repeatedly, is that the evidence disappears.

I do not require a minitrial to establish any of this. I need only ask Mr. Collier whether he is aware of the Williams case, whether he knows that prosecutors withdrew ShotSpotter evidence when it faced a Frye hearing, and whether he can point this jury to any proceeding in which ShotSpotter evidence has survived a Daubert or Frye challenge on the merits.

## The Remaining Areas of Inquiry

I will not belabor the remaining categories of intended inquiry, which I can summarize briefly. First, I intend to address the academic literature, which is uniformly unfavorable. Second, I intend to address SoundThinking's proprietary algorithm—not to obtain trade secrets, but to establish the fundamental point that neither this Court, nor this jury, nor any defendant in any case in which ShotSpotter evidence has been offered has ever been permitted to examine the mechanism underlying the conclusions Mr. Collier is presenting as expert opinion. That is not an insignificant fact, and the jury is entitled to know it.

Finally, I wish to address the documented cancellation of SoundThinking's contracts by the City of Chicago and numerous other municipalities—not to suggest that Chicago's policy judgment is binding on this Court, but because the stated reasons for those cancellations bear directly on the claims Mr. Collier made under oath today.

The specific record is worth noting. Broward County, Florida abandoned a $500,000 ShotSpotter investment after the system proved to be generating false alarms from firecrackers, car backfires, and truck downshifting.[9] Troy, New York terminated its contract after determining the system was not reliable and that ordinary 911 calls outperformed it in identifying actual gunfire.[10] Fall River, Massachusetts discontinued service after its chief of police concluded that ShotSpotter "had reported too many false alarms of gunfire while missing actual shot-fired incidents" and that the system worked less than fifty percent of the time—a far cry from ninety-seven percent accuracy.[11] Charlotte, North Carolina ended its

---

[9] Ihosvani Rodriguez, "Broward Sheriff Dropping Gunshot Detection System," *Broward County Sun-Sentinel* (November 22, 2011).

[10] Kenneth C. Crowe II, "Troy Will Turn Off ShotSpotter," *Times Union* (October 30, 2012). Available online at https://www.timesunion.com/local/article/Troy-will-turn-off-ShotSpotter-3994808.php. Last accessed March 18, 2026.

[11] Brian Fraga, "After Too Many Shots Missed, Fall River, Mass., Ends Deal with ShotSpotter," *The Herald News* (April 23, 2018). Available online at https://www.govtech.com/public-safety/after-too-many-shots-missed-fall-river-mass-ends-deal-with-shotspotter.html. Last accessed March 18, 2026.

contract after officers responding to forty-one consecutive ShotSpotter alerts were unable to find evidence of a gun being fired at any of those scenes.[12] San Antonio, Texas pulled its system after police could not find evidence of a shooting at the scene approximately eighty percent of the time and after identifying five homicide shooting victims in ShotSpotter coverage zones that the system had entirely failed to detect.[13]

## Conclusion

The Government represented at sidebar that even absent ShotSpotter evidence entirely, the abundance of shell casings at the relevant scenes would carry the day. Perhaps so. But SoundThinking's evidence has been offered, admitted, and presented through his direct examination, and it now sits before this jury as the Government's own endorsement of this technology's reliability. The defendants are entitled to test that reliability through cross-examination that is vigorous, factually grounded, and bounded by the rules of evidence—as I intend mine to be.

The cross-examination I have described does not require this jury to resolve disputed factual questions about other crimes in other cities. It requires only that the jury understand what Mr. Collier's company actually knows—and does not know—about the reliability of the system it has been selling to law enforcement for two decades. A witness who tells a federal jury that ShotSpotter is ninety-seven percent accurate while being aware of the Forbes database, the Chicago Inspector General audit, the MacArthur Justice Center findings, the Rochester failures, the SEC admissions, the absence of validation testing, and the salary-and-contract structure under which he operates has opened the door to every one of these inquiries. I intend to walk through it.

Thank you very much for your consideration in this matter. I remain available to address any further questions at Your Honor's convenience before tomorrow morning.

Respectfully submitted,

Steve Zissou, Esq.

SZ/jc

---

[12] Cleve R. Wootson, Jr., "Charlotte Ends Contract with ShotSpotter Gunshot Detection System," *The Charlotte Observer* (February 10, 2016). Available online at https://www.charlotteobserver.com/news/local/crime/article59685506.html. Last accessed March 18, 2026.

[13] Vianna Davila, "San Antonio Police Cut Pricey Gunshot Detection System" (August 16, 2017). Available online at https://www.expressnews.com/news/local/article/San-Antonio-police-cut-pricey-gunshot-detection-11824797.php.